# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

DONALD J.,

      Plaintiff,

v.                                                                CIVIL ACTION NO. 2:22-cv-549

MARTIN J. O'MALLEY,
Commissioner of Social Security,[1]

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Donald J. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order entered on January 4, 2016, and filed in this case on December 5, 2022, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's *Brief in Support* (ECF No. 13), and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 14).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT**

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023.

Claimant's request to reverse the Commissioner's decision (ECF No. 13), **DENY** the Commissioner's request to affirm his decision (ECF No. 14), **REVERSE** the final decision of the Commissioner, and **REMAND** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 44 years old at the time of his alleged disability onset date and 47 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 13.)[2] He has a high-school education, and past work as a mixing-plant worker and asphalt-mixing plant supervisor. *Id.* Claimant alleges that he became disabled on August 6, 2019, due to, *inter alia*, multiple degenerative-disc disease of the lumbar spine with chronic strain and stenosis with post-laminectomy syndrome, moderate L4-5 radiculopathy, obesity, tinnitus, bony enlargement of the wrists, and limited range-of-motion of the knees, left ankle, and fingers. *Id.* at 1-2.

Claimant filed his application for benefits on December 4, 2019. (ECF No. 1.) His claim was initially denied on March 6, 2020, and again upon reconsideration on June 26, 2020. *Id.* At Claimant's request, an administrative hearing was subsequently held before an ALJ on March 11, 2022, who entered an unfavorable decision on May 3, 2022. *Id.* Claimant then sought review of the ALJ's decision by the Appeals Council; ultimately, the Appeals Council denied Claimant's request for review on October 7, 2022, and the ALJ's decision became the final decision of the Commissioner on that date. (ECF No. 13 at 2.)

Claimant timely brought the present action on December 1, 2022, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF Nos. 7 and 8.

Commissioner submitted a transcript of the administrative proceedings on March 3, 2023. (ECF Nos. 7; 8.) Claimant subsequently filed his *Brief in Support* (ECF No. 13), and in response, the Commissioner filed his *Brief in Support of Defendant's Decision* (ECF No. 14). Finally, Claimant submitted a *Reply* brief in support of his appeal. (ECF No. 15). As such, this matter is fully briefed and ripe for adjudication.

## B. Evidence

The undersigned has considered all evidence of record, including the relevant medical evidence, pertaining to Claimant's arguments and summarizes the relevant portions here for the convenience of the United States District Judge.

### 1. Treatment Records and Medical Opinions

Plaintiff has a history of degenerative disc disease of the lumbar spine and lumbar decompression and fusion from L3-5 (Tr. 350-63; see also generally Tr. 638-884). Treatment records from PARS Neurological Associates show Plaintiff had degenerative disc disease of the lumbar spine and lumbar decompression and fusion from L3-5, prior to his alleged onset date (Tr. 652).

In July 2019, just before his alleged onset date, on examination, Plaintiff's range of motion of the lumbar spine was mildly reduced and his straight leg raise testing was positive on the right, while his sensation, gait, and muscle strength were all normal (Tr. 745). It was discussed and recommended to extend his fusion to L5-S1 (Tr. 739, 746). On August 9, 2019, Plaintiff underwent open decompression and fusion at L5-S1 (Tr. 771).

On August 6, 2019, he presented to nurse practitioner (NP) Leandra Squires for continued postoperative back and leg pain since his back surgery in December 2018. Tr. 766. His pain was 7 /10. *Id.* His right leg pain was worse than the left. *Id.* A recent CT myelogram revealed generalized disc bulging, neural foraminal encroachment, and

suspected impingement on the right S1 nerve root which may have accounted for his radiculopathy. *Id*. His review of systems was positive for fatigue, muscle weakness, cramping, pain, and numbness/tingling. (Tr. 768.) Squires observed muscle spasms in the lumbosacral spinal region. *Id*. SLR was positive on the right. *Id*. His right leg exhibited weakness; bilateral patellar reflexes were 1/4; and Hoffmann's sign—a clinical indicator of spinal-cord compression—was positive. Tr. 769. He agreed to proceed with scheduled spine surgery with neurosurgeon Rammy Gold, MD. *Id*.

On August 18, 2019, he presented to the ED with "persistent and progressive bony pain that is different than his typical back pain." (Tr. 775.) His pain was 6/10. *Id*. at 776. His lumbar spine CT revealed expected postoperative findings. *Id*. at 777. He was encouraged to keep his surgical follow-up appointment. *Id*.

Post-operative records from September 2019 show that Plaintiff complained of continued back pain with worsening symptoms in the left lower extremity (Tr. 786). On September 6, 2019, he presented for an initial evaluation with physical therapist (PT) Carly Brohard. Tr. 783. His pain was the worst in the morning. *Id*. It interfered with his sleep. *Id*. He could tolerate five hours without wearing a back brace. *Id*. His pain was progressively worsening since the last surgery. *Id*. He had decreased range of motion and strength. *Id*. His pain with activity was 9/10 and 5/10 at rest. *Id*. Slump test was positive bilaterally. (Tr. 784.) Lumbar spine flexion was 35 degrees; extension was 15 degrees. *Id*. The lumbar flexion goal was 60 degrees, and the extension goal was 25 degrees. *Id*. He continued to report pain and exhibited restricted lumbar spine range of motion despite PT. *Id*. at 785. *See also* 786-89 (Sept. 17, 2019- post-operative follow-up appointment reporting pain; PA Landyn Lucas ordered 25 mg Elavil for pain); 791 (Oct. 9, 2019 - unable to continue EMG due to pain). He had slight weakness in the left

lower extremity compared to the right and experienced pain with range of motion testing, but his gait was normal (Tr. 788- 89). He was referred for an EMG but was unable to finish the test due to discomfort (Tr. 791).

Imaging of the lumbar spine from November 2019 showed increased degenerative change and central stenosis centered at the L2-3 level, persistent left greater than right neural foraminal narrowing and at L5-S1 neural foraminal stenosis greater on the right due to a combination of degenerative changes, and some granulation tissue adjacent to the dorsal margin of the disc implant creating some mild central narrowing that also impressed upon the S1 nerve roots on the right (Tr. 794-95.) A CT myelogram of the lumbar spine identified diffuse scar tissue at the operative sites; moderate stenosis and slight clumping of the nerve roots; moderate central narrowing at L2-L3 due to degenerative changes, tissue granulation, and bone spurring; persistent left greater than right neural foraminal narrowing at L2-L3; loss of disc height at L5-S1 with bony spurring likely due to scar tissue with increase neural foraminal stenosis bilaterally. (Tr. 437-38).

In January 2020, Plaintiff complained of low back pain radiating into bilateral lower extremities, difficulty walking, and weakness (Tr. 803). His range of motion was mildly reduced, and straight leg raise testing produced pain but no radicular symptoms (Tr. 805-06). He had normal (5/5) muscle strength testing and had a normal gait and was able to stand without difficulty (Tr. 807). An extension of fusion at L2-3 and possible left L5 facetectomy was discussed, and he wanted to proceed (Tr. 806).

On February 14, 2020, Plaintiff underwent open L2 laminectomy with bilateral facetectomies and placement of a standalone interbody cage at L2-3 (Tr. 824). By the first post-operative day, Plaintiff reported "a complete resolution" of radicular pain, and he

ambulated well (Tr. 441). On February 24, 2020, he was doing well (Tr. 832). After follow-up treatment records noted some low back and lower extremity pain in the following months, Landyn Lucas, PA-C, discussed EMG and possible spine cord stimulator trial, but Plaintiff did not wish to pursue either at that time (Tr. 847). He requested a refill of Hydrocodone but was informed that he would need a referral and was continued with Elavil/Robaxin (Tr. 847). Imaging of the lumbar spine showed post-surgical changes from posterior spinal fusion and multilevel endplate degenerative changes (Tr. 848).

During a consultative examination on November 22, 2021, Stephen Nutter, M.D., noted that Claimant was comfortable in the sitting and supine positions (Tr. 1485). Dr. Nutter indicated that Claimant exhibited no tenderness or evidence of muscle spasm of the lumbar spine, although he had back pain with range of motion testing of the lumbar spine and hips (Tr. 1486). His straight leg raise testing was 30 degrees on the right and 65 on the left in the supine position, and sitting straight leg raise testing was not performed (Tr. 1486). He had no evidence of atrophy, and his sensation was well preserved except for in the 3-5 toes bilaterally (Tr. 1486). His gait was "somewhat" slow and painful with a cane but was not limping (Tr. 1486). Dr. Nutter noted that Claimant did not require a handheld assistive device, and he was unable to heel walk or squat but could toe walk and perform tandem gait (Tr. 1486). Dr. Nutter noted that Claimant's back pain was aggravated by bending, sitting, standing, lifting, coughing, walking, riding in a car; and he had a history of lumbar fusion and multilevel ODD. *Id.* He was taking Cyclobenzaprine, Amitriptyline, Oxycodone-Acetaminophen, and Ibuprofen. *Id.* His dorsolumbar exam revealed back pain with range of motion (ROM) testing of the lumbar spine and hips. ( Tr. 1486.)

6

Dr. Nutter's impressions were lumbar strain, ODD, and arthralgia. (Tr. 1486.) Further, Dr. Nutter opined that Claimant could lift and carry 20 pounds occasionally and ten pounds occasionally, sit two hours at a time for a total of four hours, stand one hour at a time for a total of two hours, and walk one hour at a time for a total of two hours in an eight-hour workday (Tr. 1490). He further opined Claimant could never climb ladders, ropes, or scaffolds, kneel, crouch, and crawl; occasionally climb ramps and stairs and stoop; and frequently balance; could tolerate occasional exposure to moving mechanical parts and vibration; could tolerate frequent exposure to unprotected heights; and could frequently operate a motor vehicle (Tr. 1491, 1493-94).

Claimant's most recent January 2022 records from Deborah Casdorph, CFNP, document that Claimant had tenderness to palpation of the lumbar spine and he moved with guarding motion; however, the records do not show whether Claimant treated with her (Tr. 1559). Nurse Casdorph advised Claimant to follow up in one year (Tr. 1560).

On July 21, 2022, Claimant presented Dr. G. Singh, MD, for a pain management consultation. (Tr. 39). He inquired about spinal cord stimulation due to severe pain refractory to his numerous spinal surgeries and prior lumbar injections. *Id.* His pain was 8/10 concentrated in the lower back and radiating into both legs. *Id.* His right leg pain was significantly worse than the left. *Id.* He described it as pulsating, aching, cramping, throbbing, shooting, stabbing, electrical, tingling, and burning. *Id.* It was exacerbated by standing and walking, and alleviated by rest, sitting, lying, and medication. *Id.* His pain occurred daily. *Id.* It was associated with lower extremity weakness, numbness, tingling, and gait changes. *Id.* He tried Ibuprofen, Hydrocodone, Flexeril, and Elavil. *Id.* He also attempted PT in the past, but he continued to experience chronic pain. Tr. 40. His symptoms were worsening. *Id.* His gait was abnormal. *Id.* at 42. Claimant's SLR was

positive bilaterally. *Id.* Facet loading test was positive in lumbar region. *Id.* Compression of SI joints provoked pain. *Id. 22* Dr. Singh explained that the most likely cause of his pain was lumbar spondylosis with lumbar disc disease, facet a1thropathy, and lumbar stenosis. Tr. 45. He explained the risks associated with spinal cord stimulation, including infection, bleeding, nerve injury, and failure to improve pain or worsening of pain. *Id.* He explained that Claimant would require a neurosurgical evaluation if he wished to pursue this option. *Id.* In the meantime, he instructed him to continue conservative care, including heat/ice, medication, exercise, and lifestyle modifications. *Id.*

### 2. *Claimant's Hearing Testimony*

Claimant testified briefly during his hearing before the ALJ on March 11, 2022. (Tr. 1579-1589.) Claimant testified that he has had multiple spinal fusions and injections, and is unable to perform full-time work because his impairments require him to lie down every 45 minutes to stretch his back out for about 10 minutes at a time, and stretch his leg out. (Tr. 1583-1585.) Additionally, he has severe right-leg pain, muscle spasms down his right leg requiring him to shift positions frequently, and difficulty putting pressure on his right leg. (Tr. 1584-1586.) Further, Claimant testified that he has low-back pain limiting him to sitting for 15 minutes and standing for 15 to 20 minutes. *Id.* Claimant also testified that he can lift about 15 pounds, cannot not walk the length of a football field, and cannot bend over to pick something up. (Tr. 1585-1586.)

With respect to his activities of daily living, Claimant testified that he must take his time when performing daily activities; however, he can independently care for his personal hygiene and prepare simple meals. (Tr. 1588.) He can use a riding lawn mower for short periods, watch television, help with some shopping, and attend social meetings

once per month. *Id.* Finally, Claimant testified that he continues to go hunting, but not as much as he used to do. *Id.*

### 3. *Vocational Expert Hearing Testimony*

At the hearing, the ALJ employed a vocational expert ("VE") to aid her in determining whether Claimant could perform his past relevant work or other work. (Tr. 1589.) The ALJ asked the VE to classify Claimant's past relevant work, and the VE testified that Claimant's work as a mixing-plant worker was classified as heavy, unskilled work, with a Specific Vocational Preparation ("SVP") rating of 2, along with asphalt mixing plant supervisor, which the VE classified as light, skilled, composite work, with an SVP rating of 7. (Tr. 1589-1591.) The ALJ next asked the VE if a hypothetical individual with the same age, education, and work history as the Claimant, would be able to perform the Claimant's past work, assuming that the individual could lift 20 pounds occasionally, and 10 pounds frequently; stand and walk four hours in an eight-hour day; and sit at least six hours in an eight-hour day. (Tr. 1591.) Further, the individual could occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance and stoop; never kneel, crouch, or crawl; could tolerate occasional exposure to extreme temperatures and vibrations; and have no exposure to hazards. *Id.*

In response to the ALJ's hypothetical, the VE testified that such an individual could not perform Claimant's past work. *Id.* However, he opined that the individual could perform other work—specifically, entry-level, unskilled work with a light classification, and an SVP rating of 2. *Id.* In response to the ALJ's request, the VE provided a representative sampling of such positions in the national economy, such as parking-lot booth attendant, textile worker, and non-governmental mail clerk. (Tr. 1591-1592.) Additionally, the VE testified that the individual could perform entry-level, unskilled

work with a sedentary classification, and an SVP rating of 2, and provided a representative sampling of such positions in the national economy: table worker, surveillance monitor, and assembler. (Tr. 1592.)

The ALJ then asked the VE whether his opinion would change if the individual could not perform "frequent handling, fingering and feeling." *Id.* In response, the VE testified that "the textile worker would be eliminated" from the representative list of light positions, and the table worker position would be eliminated from the list of sedentary positions. (Tr. 1592-1593.) However, the VE testified that the hypothetical individual could still perform representative work in light positions such as laundry worker, and in sedentary positions such as optical assembler. (Tr. 1593.) With respect to off-task behavior, the VE testified that off-task behavior greater than nine percent of the workday would bar the individual from sustaining full-time, competitive employment; likewise, more than six absences, or greater than one day per month would eliminate full-time work. (Tr. 1593.) Finally, the VE testified that if the combination of symptoms prevented the individual from completing a normal work schedule on a sustained and consistent basis, then all work would be eliminated. (Tr. 1593-1594.)

Claimant's counsel then questioned the VE briefly, eliciting testimony that all of the representative positions provide for a "sit/stand option." (Tr. 1594.) Further, the VE testified that if a hypothetical individual needed to lie down for ten minutes at a time once every 45 minutes, that would be an off-task issue and preclude all other work. *Id.*

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. §
423(d)(1)(A). The Social Security Administration has established a five-step sequential
evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4),
416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds
through each step until making a finding of either "disabled" or "not disabled"; if no
finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4),
416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v.
Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340
(4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he
became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether
the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ
moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's
medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii),
416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence.
*See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or
combination of impairments that is not classified as "severe" and does not satisfy the
durational requirements will result in a finding of "not disabled." 20 C.F.R.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir.
2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment
or combination of impairments meets or is medically equal to the criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision, and had not engaged in substantial gainful activity since the alleged disability-onset date. (Tr. 13.) She found that Claimant's multiple degenerative-disc disease of the lumbar spine with chronic strain and stenosis with post laminectomy syndrome, moderate L4-5 radiculopathy, and obesity, constituted "severe" impairments. (Tr. 13-14.) However, she found that those impairments, or a combination thereof, failed to meet, or medically equal, any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able to perform light work, with the following limitations: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for six hours, and

standing/walking for four hours in an eight-hour workday; never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl; occasionally climb ramps and stairs, balance, and stoop. (Tr. 14.) Additionally, the ALJ found that Claimant "can tolerate occasional exposure to extreme temperatures and vibration but no exposure to hazards." *Id.*

The ALJ concluded that given the limitations imposed in the RFC, Claimant would be unable to perform any past relevant work. (Tr. 19.) Additionally, the ALJ noted that Claimant is "a younger individual" with "at least a high school education," and that transferability of job skills was not material to the determination of disability. *Id.* Because the ALJ determined that Claimant was unable to perform the full range of light or sedentary work, she enlisted a VE to aid in her finding that Claimant is capable of making a successful adjustment to other work that exists in specific numbers in the national economy, including the VE's representative positions of parking lot booth attendant, mail clerk, and textile worker at the light exertional level, as well as the sedentary positions of table worker, surveillance system monitor, and assembler. (Tr. 19-20.) Based upon the VE's testimony, the ALJ concluded that Claimant was not under a disability during the relevant time period. (Tr. 20.)

## II.   LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: the ALJ's factual findings must be upheld if supported by substantial evidence, reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court

"looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

In support of his appeal, Claimant argues that the ALJ erred by failing to properly evaluate (1) Claimant's self-description of his limitations, and (2) the medical opinion evidence, particularly that of Dr. Nutter. Claimant concludes that the ALJ thus erred by failing to account for the "total limiting effects" of Claimant's impairments in determining a Claimant's RFC, as required by § 404.1545(e). (ECF No. 13 at 3.) In response, the Commissioner argued that the ALJ's determination was supported by substantial evidence and should be affirmed.

### A. Claimant's Subjective Description of His Limitations

First, Claimant argued that the ALJ erred by discrediting Claimant's subjective description of his physical limitations, because an ALJ must consider *all* the practical effects for each impairment—both severe and non-severe—and failure to do so is error. (ECF No. 13 at 9 (citing *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015).) Here, the ALJ relied solely on "objective" evidence, and did not factor Claimant's sworn testimony and other subjective evidence of Claimant's limitations. In response to Claimant's argument, the Commissioner argues that the ALJ's analysis sufficiently accounted for all

established work-related limitations, and as a result her RFC determination is supported by substantial evidence. (ECF No. 14 at 9.) According to the commissioner, the ALJ rejected Claimant's testimony as less credible than the "objective medical evidence" because, in her view, Claimant's condition was stable; he reported that his medication was effective; he suffered no adverse side effects from treatment or medication; he prepared simple meals; he used a riding mower for short periods; he hunted and attended social-club meetings occasionally; and he watched television. (Tr. 18.)

The ALJ's determination is erroneous for two key reasons. First, the ALJ erred in discounting Claimant's subjective complaints on the express grounds that they were unsupported by objective medical evidence. To the contrary, the applicable regulations expressly provide that subjective symptoms *alone* can cause work-preclusive limitations, and that the full limiting effects of an individual's symptoms may be greater than the objective medical evidence alone establishes. *Arakas v. SSA,* 983 F.3d 83 (4th Cir 2020) *(*citing §§ 404.1529(c)(2)-(3); SSR 16-3p).

In *Arakas,* the Fourth Circuit held that ALJs may not rely on objective medical evidence (or the lack thereof)-even as just one of multiple factors-to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." *Id.* at 97. Moreover, in *Arakas,* the Court was clear that it was "reiterate[ing] the long-standing law in our circuit that disability claimants are *entitled to rely exclusively on subjective evidence* to prove the severity, persistence, and limiting effects of their symptoms," as well as to prove that his symptoms were so continuous or severe that they prevented him from working a full hour workday. *Id.* at 98 (emphasis added). As a result, the Fourth Circuit in *Arakis* found that the ALJ applied an "incorrect legal standard in discrediting a claimant's

complaints based on lack of objective evidence corroborating them." *Id. See also Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017)).

Completely sidestepping *Arakis*, the ALJ rejected Claimant's testimony as less credible than the "objective medical evidence" because, in her view, Claimant's condition was stable; he reported that his medication was effective; he suffered no adverse side effects from treatment or medication; he prepared simple meals; he used a riding mower for short periods; he hunted and attended social-club meetings occasionally; and he watched television. (Tr. 18.) However, it is well-settled that such sporadic activities are not inconsistent with an allegation of disability, defined as the inability to work on a regular and continuous basis. *Totten v. Califano,* 624 F.2d 10 (4th Cir. 1980); *Mascio,* 780 F.3d at 636-37; *Amavisca v. Benyhill,* 2018 U.S. Dist. LEXIS 187233, at *27 (W.D.N.C. 2018) (An ALJ must consider the difference between a claimant's being able to engage in sporadic physical activities and being able to work eight hours a day for five consecutive days in a week).

Moreover, "an ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." *Arakas,* 983 F.3d at 99. For example, the ability to attend monthly social-club meetings, watch TV, prepare simple meals, or use a riding mower for short periods does not address the *central issue of Claimant's ability to perform work on a sustained full-time basis.* As Claimant testified, he is unable to work because he must lie down and stretch his back out every 45 minutes, for about 10 minutes at a time. (Tr. 1583-1585.)  He has severe right-leg pain, has difficulty putting pressure on it, and he cannot walk the full length of a football field. (Tr. 1583.) He must get up to move around after sitting for 15 minutes. (Tr. 1584.) He can only stand in place for 15 to 20 minutes. *Id.* He must frequently shift positions to deal

with muscle spasms in his right leg. (Tr. 1586.) He must take his time when performing daily activities. (Tr. 1588.) Yet, the RFC does not account for any off-task time related to Claimant's need to lie down or frequently shift positions; nor does it account for Claimant's limited ability to sit, stand, and walk throughout the day. This is error. Accordingly, just as in *Arakas*, the undersigned **FINDS** that the ALJ erred by failing to properly consider Claimant's self-description of his limitations and relying solely on "objective" evidence.

Second, the ALJ's determination is erroneous because her analysis directly contradicts the Fourth Circuit's express finding in *Arakis*, that an ALJ's decision cannot simply list evidence and then set forth a conclusion; rather, the ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion." *Arakis*, 983 F.3d at 83. The ALJ's decision repeatedly fails to build that bridge and tether evidence—including completely passive activities such as merely *watching television*—to her conclusion that Claimant was able to perform more than he portrayed. But these activities of daily life, such as passively gazing at a screen, do not naturally lead to the ALJ's conclusion. Thus, without the ALJ's explanation of her logic and reasoning to connect the evidence and her conclusion, the Court is unable to meaningfully review the Commissioner's determination. Under *Arakis*, this constitutes error.

Responding to Claimant's argument, the Commissioner asserted that *Arakas* was limited to impairments that lack objective indicia, like fibromyalgia. (ECF No. 13 at 13-14.) This argument, however, has not been successful within the Fourth Circuit. *See Joseph J. v. Kijakazi*, 21-cv-2194, 2022 WL 102339, n.2 (D. Md. June 8, 2022) (describing the "trend" towards rejecting argument that *Arakas* is limited to fibromyalgia or like impairments). The Fourth Circuit, in a recent 2023 opinion,

expressly clarified that *Arakis* is not limited to cases involving fibromyalgia. *Oakes v. Kijakazi*, No. 21-2421, 2023 WL 14117, at *4, 14-15 (4th Cir. June 7, 2023) (finding that discrediting complaints based on a lack of objective evidence is improper regardless of a fibromyalgia impairment).

Pursuant to this principle, the Fourth Circuit in *Oakes* found that the ALJ erroneously increased Claimant's burden and relied solely on objective medical evidence to discount Claimant's subjective complaints, which warranted remand. Because the same circumstances are present in the matter at hand, the Commissioner's argument fails.

The ALJ's assessment of Claimant's testimony relied on misstatements of the record, ignored well-established law regarding subjective complaints, and failed to tether the ALJ's conclusions to the record evidence using a logical bridge sufficient for this Court to perform meaningful review. As a result, this Court is unable to find that the ALJ's determination is not supported by substantial evidence, and remand is proper.

### B. Medical Opinion Evidence

Finally, Claimant argued that the ALJ failed to adequately explain her chain of logic in evaluating the opinion evidence of Claimant's healthcare provider, Dr. Nutter. The ALJ found Dr. Nutter's opinion not entirely persuasive because the examiner provided no rationale for limiting Claimant's ability to sit, stand, and walk at one time and total number of hours in an eight-hour workday (Tr. 17; see Tr. 1491).

When an ALJ rejects a medical opinion, she must provide a sufficient explanation for doing so. SSR 96-8p ("If the RFC conflicts with an opinion from a

medical source, the adjudicator must explain why the opinion was not adopted."). For claims filed after March 27, 2017, analysis of medical opinions must articulate, first, which medical opinions and prior administrative medical findings meet a threshold requirement of being "persuasive," by assessing the "most important factors" of consistency and supportability. *See* § 404.1520c(a). The ALJ therefore must explain her decision in a way that permits meaningful judicial review, as set forth *supra*.

Here, Claimant's testimony is supported by Dr. Nutter's more restrictive limitations related to his ability to sit, stand, and walk. Yet, the ALJ rejected his opinion because, in the ALJ's view, he did not provide a rationale for those limitations, and Claimant's pain was managed by medication. Tr. 17. But Dr. Nutter's medical opinion regarding his ability to sit, stand, and walk was supported by physical findings from the consultative examination. As Claimant highlighted in his briefing, these findings were the rationale for Dr. Nutter 's opinion.

The ALJ herself noted the following pertinent findings from Dr. Nutter's evaluation: Claimant's gait was slow and painful; he was walking with a cane; he was unable to heel walk or squat; and his lumbar range of motion was limited and accompanied by back pain. Id. During this evaluation, he also reported that his back pain was aggravated by bending, sitting, standing, lifting, coughing, walking, and riding in a car. Tr. 1484. These symptoms persisted despite the prescription of various pain medications. Id. Likewise, Claimant's SLR in the supine position was noted to be limited due to back pain. (Tr. 1486 (noting Claimant was unable to perform sitting SLR due to pain.) Not discussed by the ALJ *at all* was the critical finding that Claimant's lower extremity reflexes were absent or severely diminished. (Tr. 1487.) These findings support

Claimant's testimony regarding his limited ability to sit, stand, and walk, as well as his need to frequently lie down.

In summary, the undersigned **FINDS** that the ALJ's failure to provide a logical and reasonable bridge between the evidence and her RFC assessment of Claimant is error. Thus, this matter must be remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). *Patterson,* 846 F.3d at 662-63.

### IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request to reverse the Commissioner's decision (ECF No. 13), **DENY** the Commissioner's request to affirm her decision (ECF No. 14), **REVERSE** the final decision of the Commissioner, and **REMAND** this action from the Court's docket pursuant to sentence four of 42 U.S.C. § 405(g).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: January 31, 2024

Dwane L. Tinsley
United States Magistrate Judge